C. J. ROTEN, Administrator, Appellant, v. TESDELL & MACKAMAN, Appellees.

IN RE ESTATE OF MATTIE P. SYLVESTER.

**ATTORNEY AND CLIENT: Compensation—Illegal Contract for Fee.**
1 An agreement to pay an attorney fee contingent upon the procurement of a divorce and the adjustment of property rights in connection therewith is void because violative of public policy.

**CONTRACTS: Legality of Object and of Consideration—In Pari Delicto.**
2 A party to an executed illegal contract may be permitted to recover money paid thereon:
   1. When, because of the intrinsic illegality of the contract, public policy would be promoted by permitting such recovery, or
   2. When, from the attendant circumstances, the court may say that the party asking the recovery is *essentially less blameworthy* than the party from whom recovery is asked.

**CONTRACTS: Legality of Object and of Consideration—In Pari Delicto.**
3 On the question whether the parties to an executed illegal contract are *in pari delicto,* due consideration should be given to the fact that the services rendered were quite modest, while the sum paid therefor was quite exorbitant.

**EQUITY: Laches and Stale Demands—Ignorance of the Law.**
4 Pardonable ignorance of the law may, under some circumstances, quite satisfactorily explain the delay in presenting a claim.

*Appeal from Polk District Court.*—JAMES C. HUME, Judge.

MARCH 13, 1923.

REHEARING DENIED JUNE 22, 1923.

A summary proceeding on a motion under Code Section 3826, to require defendants, as attorneys for the plaintiff's intestate, to account for and repay to the plaintiff fees obtained by said defendants in a divorce proceeding in which they were attorneys for plaintiff's intestate. The trial court denied plaintiff the relief sought.—*Reversed and remanded.*

*E. D. Samson* and *F. H. Noble,* for appellant.

*Stipp, Perry, Bannister & Starzinger,* for appellees.

FAVILLE, J.—On April 12, 1915, the appellant's intestate married one George E. Campbell. They lived together as husband and wife until May 12, 1918, when she left him at Council

1. ATTORNEY AND CLIENT: compensation: illegal contract for fee.

Bluffs, and proceeded to Gilbert, Iowa, where a sister resided. She was the owner in her own right of property valued at from $50,000 to $60,000. Her husband had no property at the time of the marriage, and accumulated nothing thereafter. It appears that a greater part of the time after the marriage was spent by the parties in traveling to various parts of the country. Among the property owned by the appellant's intestate at the time of her marriage was a farm in Jasper County, which was sold, and a portion of the proceeds invested in land in Harrison County, the title to which was taken in the names of the husband and wife, as tenants in common. After arriving at the home of her sister, in May, 1918, appellant's intestate decided that she would apply for a divorce from her husband. In company with her sister, she consulted the local banker at the town of Gilbert, who was the cousin of the appellee Tesdell. The banker suggested to her and her sister that she consult Tesdell, and recommended him as a man worthy of confidence, and one who would treat her right. At her request, the banker communicated with Tesdell, who came to Gilbert to see her on May 18th. At that time, the

talk appears to have been quite general, and Tesdell returned home, and was later summoned to Gilbert for further conference with appellant's intestate on May 22d, at which time a contract was entered into in writing between the parties, as follows:

"May 22nd, 1918.
"Mrs. Mattie P. Campbell, Gilbert Station, Iowa.
"Dear Madam: We hereby agree to take your case against George E. Campbell for divorce, property settlement and prosecution on criminal charges if deemed advisable, and will handle the matter to settlement in court or outside of court in a satisfactory manner. For our services and the services of other attorneys, if needed in settling your rights to money and property, we will accept a payment equal to twenty per cent of all the money or other property in which the said Geo. E. Campbell has any interest, either present or contingent, by reason of marriage relation, contracts, will or in any manner, which shall be established by suit or by settlement as the property of yourself. It is understood that you are to advance us $100 which is to be applied as necessary on our expenses, and which is to be deducted from the 20 per cent when the matter is disposed of. We are to pay all our other expenses, excepting court costs.
"Yours truly,
"Tesdell & Mackaman.
"By E. S. Tesdell."

"May 22, 1918.
"I hereby accept the above proposition and agree to the terms and fees therein stated.        Mattie P. Campbell."

After said contract had been entered into, the appellees instituted an action for divorce, and filed a petition in the district court of Story County, and procured writs of attachment to issue to Harrison County and Pottawattamie County, and certain property was attached and some garnishments were had. One of the appellees spent a few days at Council Bluffs, looking up evidence in the divorce case, and it was anticipated that it would be necessary for one of the appellees to go to foreign states to secure evidence; but this was not done. Shortly after the filing

of the petition for divorce, the attorney for Campbell called upon the appellees in regard to a settlement of the divorce proceedings. It was finally arranged that the attorneys should meet, on July 11th, at Grinnell, to which place appellant's intestate and her sister had removed. Negotiations were had between the attorneys for the parties at said time, with respect to a settlement of the property rights of the parties. The attorney for Campbell at first insisted that his client should receive $5,000 of the proceeds of a contract for the sale of the land owned in common, but later this proposition was modified, and a basis of settlement of property rights was finally agreed upon without the payment of any sum to Campbell, by which he consented to pay $500 on appellees' attorney fees. Campbell's attorney expressed a desire to have the matter disposed of without further delay, and it was suggested that the case be transferred to Tama County for hearing, where court was at that time in session; and the attorney for Campbell suggested that he would testify as a witness in said cause, to the effect that his client had admitted to him that he had been guilty of adulterous relations with another woman, who had been the traveling companion of the parties. This arrangement was carried out. Shortly thereafter, an order transferring the cause and a transcript of the files were procured. The defendant did not appear in said action. Formal proof of the matters alleged in the petition was had, and a decree prepared and signed. At the time of the conference at Grinnell, the appellee Tesdell secured the signature of appellant's intestate to a written instrument which he prepared, fixing the amount of the fee, and this was paid to the appellees in 1918, shortly after the divorce was granted. Appellant's intestate died in March, 1921, and this action was commenced by her administrator on September 20, 1921.

I. The first question for our consideration is whether or not the contract between the decedent and appellees was illegal and void.

It was not illegal merely because it provided for a contingent fee to be paid appellees for their services. There was no suggestion of maintenance in the contract. It was not champertous. It expressly negatived the idea that appellees were to pay any portion of the court costs. Ordinarily, a contract between

attorney and client, providing for the payment of a fee for legal services contingent upon the results obtained by the attorney, without more, is not an illegal contract, but one that is enforcible. *McDonald v. Chicago & N. W. R. Co.,* 29 Iowa 170; *Winslow v. Central Iowa R. Co.,* 71 Iowa 197; *Dunham v. Bentley,* 103 Iowa 136; *Rickel, Crocker & Christy v. Chicago, R. I. & P. R. Co.,* 112 Iowa 148; *Graham v. Dubuque Spec. Mach. Works,* 138 Iowa 456; *Clancy v. Kelly,* 182 Iowa 1207.

II.    But the contract in the instant case involved more than the mere question of the payment of a contingent fee to appellees for legal services. It involved an agreement to pay an attorney's fee contingent upon the procurement of a divorce and the adjustment of property rights in connection therewith. Such a contract, having for its object such a purpose, is one that involves a matter of public policy. The proper maintenance of the marriage relation is a matter of public concern.

In general, a contract the object of which is the procurement of a divorce is against public policy and void. *Barngrover v. Pettigrew,* 128 Iowa 533; *Pereira v. Pereira,* 156 Cal. 1 (103 Pac. 488); *Hamilton v. Hamilton,* 89 Ill. 349; *Jordan v. Westerman,* 62 Mich. 170 (28 N. W. 826); *Wilde v. Wilde,* 37 Neb. 891 (56 N. W. 724); *James v. Steere,* 16 R. I. 367 (16 Atl. 143).

A contract between an attorney and client providing for the payment of a fee to the attorney contingent upon the procurement of a divorce for the client is against public policy, and illegal and void. Such a situation involves the personal interest of the attorney in preventing a reconciliation between the parties, a thing which the law favors and public policy encourages. *Newman v. Freitas,* 129 Cal. 283 (50 L. R. A. 548, 551). See, also, *Muckenburg v. Holler,* 29 Ind. 139; *Speck v. Dausman,* 7 Mo. App. 165.

The sanctity of the marriage relation, the welfare of children, the good order of society, the regard for virtue, all of which the law seeks to foster and protect, are ample reasons why such contracts should be held to be contrary to public policy.

We therefore hold that the contract in controversy in this suit was, upon its face, against public policy, and unenforcible at the instance of either party.

III.    The contract in the instant case is not, however, an

executory contract. Neither party thereto is seeking to enforce the same against the other. It has been fully and completely performed by both parties, and such performance acquiesced in for a period of three years prior to the commencement of this action.

2. CONTRACTS: legality of object and of consideration: *in pari delicto.*

The appellant herein, as administrator of the estate of the decedent, can have no greater rights in the premises than could the decedent, if living. We then meet the inquiry: Can one party to an illegal contract that has been fully executed, recover from the other party money that has been paid such party under said contract and in fulfillment thereof?

Appellees invoke the maxim, *"in pari delicto potior est conditio defendentis"* ("when both parties are equally in fault, the condition of the defendant is preferred"), or, as it is frequently expressed, "where both parties are guilty, the court will leave them where it finds them." This maxim is of ancient origin. *Smith v. Bromley,* 2 Doug. 696. It is recognized both at law and in equity. *Baldwin v. Campfield,* 8 N. J. Eq. 891, 899. The rule is frequently invoked in cases of illegal contracts, and the general rule is that, whether the contract is executory or executed, relief will be denied.

There are also well recognized limitations to the application of this general rule. There are instances where the contract is illegal, and yet the parties are not *in pari delicto,*—that is, they are not in equal wrong,—and in such instances, relief may be had. In 2 Pomeroy on Equity Jurisprudence (4th Ed.), Section 941, the author says:

"To the foregoing rules there is an important limitation. Even where the contracting parties are *in pari delicto,* the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him. In pursuance of this principle, and in compliance with the demands of a high public policy, equity *may* aid a party equally guilty with his opponent, not only by canceling and ordering the surrender of an executory agreement, but even by setting aside an executed contract, conveyance, or transfer, and decreeing the recovery back of money paid or property delivered in performance of the agreement. The cases in which this limitation may

apply and the affirmative relief may thus be granted include the class of contracts which are intrinsically contrary to public policy,—contracts in which the illegality itself consists in their opposition to public policy, and any other species of illegal contracts in which, from their particular circumstances, incidental and collateral motives of public policy require relief.''

The author cites the instance of borrowers in usurious contracts and marriage-brokerage contracts as being of this class.

The learned author continues (Section 942):

''Lastly, when the contract is illegal, so that both parties are to some extent involved in the illegality,—in some degree affected with the unlawful taint,—but are not *in pari delicto*,—that is, both have not, with the same knowledge, willingness, and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworthy,—a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent, and may grant him full affirmative relief, by canceling an executory contract, by setting aside an executed contract, conveyance, or transfer, by recovering back money paid or property delivered, as the circumstances of the case shall require, and sometimes even by sustaining a suit brought to enforce the contract itself, or, if this be impossible, by permitting him to recover the amount justly due, by means of an appropriate action not directly based upon the contract. Such an inequality of condition exists, so that relief may be given to the more innocent party, in two distinct classes of cases: 1. It exists where the contract is intrinsically illegal, and is of such a nature that the undertakings or stipulations of each, *if considered by themselves alone,* would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction, and affecting the relations of the two parties, which render one of them comparatively free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement, or of procuring him to execute and perform it after it had been voluntarily entered into. 2. The condition also exists where, in the absence of any incidental and collateral circumstances, the contract is

illegal, but is *intrinsically* unequal; is of such a nature that one party is necessarily innocent as compared with the other; the stipulations, undertakings, and position of one are essentially less illegal and blameworthy·than those of the others.''

Many cases are cited to sustain the text.

The contract involved in this case comes within both of the exceptions noted by Pomeroy to the *in pari delicto* rule. The contract was illegal for the very reason that it was in contravention of public policy. It is of the general character and on a similar footing with marriage-brokerage contracts, which, being against public policy, are illegal. In such cases, the party who has paid his money under the contract may recover the same in a proper action, because the contract is intrinsically against public policy. *Smith v. Bromley,* supra; *Bellamy v. Bellamy's Admr.,* 6 Fla. 62, 103; *Weakley v. Watkins,* 7 Humph. (Tenn.) 356.

It is apparent that the contract involved in this case is illegal solely because it is against public policy. It is not illegal because of its being a contingent fee contract, or because it is immoral. It is illegal because public policy demands that such a contract shall not be made. It is on a par with marriage-brokerage contracts, and is illegal for the same reason of public policy that denies validity to contracts that have a tendency to improperly interfere either with the creation or the destruction of the marriage relation. Therefore, the contract being intrinsically against public policy, and being illegal for this reason alone, the maxim *in pari delicto* does not apply. This is the exception noted by text-writers and by the adjudicated cases. This case comes squarely under this exception.

IV. Again, the contract in this case likewise comes within the other exception to the rule ''*in pari delicto.*'' It is of such a nature that the position of one party is essentially less illegal and blameworthy than that of the other. The parties did not stand on an equal footing in all respects regarding the contract and the wrong in entering into it.

It is a fact not to be overlooked that these parties, by this contract, entered into the relation of attorney and client. True, the relation did not exist prior to the making of the contract. We have held that, in entering into the contract which creates

the relation of attorney and client, no fiduciary relation then exists, and the parties are dealing at arm's length. *Edler v. Frazier,* 174 Iowa 46. In said case we said, however:

"This is not to say that a contract which bears upon its face the evidence of undue advantage over the client will be held any more sacred in the hands of a lawyer than when sought to be enforced by any other person, and, when it clearly appears that the contract is unconscionable or manifestly oppressive, or that an agreement for extraordinary compensation has been obtained by the solicitations of an 'ambulance chaser' or the use of other unprofessional arts to entrap the ignorant or unwary, no court will hesitate to protect both the honest client and the reputable lawyer by compelling him who asks the benefit of such agreement to purge it of its apparent inequity. *Ryan Bros. v. Ashton,* 42 Iowa 365.''

In *Davidson v. Carter,* 55 Iowa 117, we said:

"The plaintiff was not aware that he was violating the law in the execution of the mortgage for the purpose of placing his property beyond the reach of creditors. The defendant was aware that the act was a violation of law, and afterward he sought to deter the plaintiff from disclosing the facts by telling him that he was liable to be sent to the penitentiary. The point mainly relied upon by the appellant is that, if the facts are as claimed by the plaintiff, he can have no relief, because he was a party to a fraudulent and unlawful act. That a party who is *in pari delicto* cannot make his illegal act the basis of a recovery has been definitely settled by this and other courts. But where a stronger mind takes advantage of a weaker, and by persuasion and influence procures the unlawful act, this rule ceases to be applicable. The wrong then rests chiefly, if not solely, on the person by whom it was contrived, and his confederate is regarded as the mere instrument for accomplishing an end not his own. If a party should be allowed immunity under such circumstances, he would be permitted to take advantage of his own wrong, and reap a benefit from his fraud."

In this case, we have, on the one hand, as a party to the contract, plaintiff's intestate, a woman about 64 years of age. She is described as being "very nervous" and "subnormal." She had been married for about three years. She had just left her hus-

band, whom she believed to have been guilty of adultery, and was in a state of mental distress and worry. She owned at the time property worth from $50,000 to $60,000. Since her marriage, a portion of her funds had been invested in lands which had been taken in the names of herself and her husband jointly. The husband had no property. She was desirous of securing a divorce, and contemplated prosecuting her husband in a criminal action. She was evidently fearful of losing a large portion or all of her property. Under these circumstances, she consulted one of the appellees as an attorney, for counsel and advice. There was some talk about fees, and it appears that the attorney suggested that he be employed on a per diem basis. It is his contention that it was plaintiff's intestate who suggested that she did not want to incur the cost of attorney fees and expenses of investigation for days, and perhaps weeks, on an uncertainty, and that she did not want to pay anything unless a divorce was obtained for her. Appellee says that he first suggested to her that his firm would take the case for a fee of 25 per cent on whatever was settled on her as her property, "including anything that there was no question about, including anything she might have any dower interest in, or anything else." The percentage was finally reduced by appellee to 20 per cent, as expressed in the written contract. Appellee makes no claim that he suggested to the plaintiff's intestate that such a contract would be illegal and against public policy. As an attorney, he is, of course, presumed to have known such to be the law. As to her, the most that can be said is that ignorance of the law is not a legal excuse. Can any person view this situation and say that these parties, in entering into this contract, were "equally guilty," and that they are in pari delicto?

Applying the rule of the second exception above noted, we think that, under the record in this case, it must be held that the plaintiff's intestate was less blameworthy than the appellees, and is entitled to restoration of the money paid under the contract.

Again, it is apparent from the record that the services required and actually rendered in the case were so disproportionate to the fee received that they necessarily enter somewhat into

**3. CONTRACTS: legality of object and of consideration: *in pari delicto*.** the question of whether or not the parties are equally to blame for entering upon the illegal contract. No perplexing or unusual question of law was involved in the case. The divorce was obtained without contest, and with the active co-operation of the defendant's counsel. The defendant readily abandoned any claim to any of the property of plaintiff's intestate, including whatever interest he apparently had in the portion that had been purchased with her funds and taken in the names of the parties jointly. No arduous or difficult tasks were encountered, no extraordinary labors or services were performed. The plaintiff's intestate had purchased and paid for every dollar of property that was "restored" to her by the decree of divorce. An attorney could not have felt that he was assuming any very great risk in the task of undertaking to obtain for his client a good title to her own property, as against the claims of a husband guilty of adultery.

Appellee testifies that he proposed to charge her the percentage on her property, "including anything that there was no question about." Just why she should pay a percentage on her own property "that there was no question about" is difficult to understand. The rights of a husband guilty of adultery, in the property of plaintiff's intestate, owned in her own right, and to the acquisition of which he had never contributed a dollar, either in money or effort, were not very difficult of discernment. The contingency which appellees assumed was not hazardous.

After the divorce had been obtained, without a defense, and by the assistance of the defendant's counsel as the main witness, the fee was promptly adjusted. The property was listed and valued as follows:

| | |
|---|---|
| "Cadillac Auto | $2,000.00 |
| Money received and to be paid on 80-acre farm sold | 13,000.00 |
| 160 acres of land subject to $7,000 mtg. | 36,000.00 |
| San Francisco lots | 3,000.00 |
| Total | $54,000.00" |

Twenty per cent was computed on this total valuation, and the same amounted to the not insignificant sum of $10,800, which amount appellees received.

We are not trying in this case the question of the reasonable value of appellees' services. We are considering the question of the amount of the fee solely as it bears upon the question of whether or not these parties are *in pari delicto;* and certainly the collection of such a charge, for such a service, under a contract confessedly illegal, has some proper bearing on the question as to whether or not the parties to the contract are "in equal wrong."

It is unnecessary that we comment on the duties of an attorney, not only to the honorable profession to which he belongs, but also to his client and to himself. When appellees were admitted to practice law in this state, they became subject to the duties prescribed by Section 317 of the Code, among which is "not to encourage either the commencement or continuance of an action or proceeding from any motive of passion or interest." No such duty rested upon plaintiff's intestate. She was not seeking to enter into a contract known to her to be illegal and contrary to public policy. She was going to a lawyer, at a time of great mental distress and trouble, to obtain legal advice and assistance to relieve her from the incubus of an adulterous and worthless husband, and to secure a restoration of her property rights. The parties did not stand on a parity, either as to their knowledge as to the illegality of the contract or their motives for entering into it. It would be a reproach to the law to hold that, under such circumstances as are disclosed by this record, the parties to this contract are *in pari delicto.* We refuse to so hold.

As bearing somewhat on the questions herein discussed, see 1 Story on Equity Jurisprudence (13th Ed.), Section 300; *Rozell v. Vansyckle,* 11 Wash. 79 (39 Pac. 270) ; *Wright v. Stewart,* 130 Fed. 905, 921; *Ford v. Harrington,* 16 N. Y. 285; *Lindsley v. Caldwell,* 234 Mo. 498 (137 S. W. 983) ; *Phillips v. Bradford,* 147 Ala. 346 (41 So. 657) ; *Poston v. Balch,* 69 Mo. 115.

V. It is contended that the appellant's claim is stale; that appellant's intestate acquiesced in the contract, paid the fee provided for, and made no complaint, and did not attempt to

4. Equity: laches and stale demands: ignorance of the law.

secure a restoration during the three years that she lived thereafter.

There is no word of evidence that appellant's intestate ever knew that the contract was illegal or against public policy. She could not be expected to act without actual knowledge of her rights. The action is not barred by the statute of limitations. The claim is not stale. There is no estoppel present. The appellant was entitled to the relief demanded.

VI. This action is a special proceeding, under Code Sections 3826 to 3830 inclusive. Appellees, in response to appellant's motion, joined issue on the question of their right to retain the entire fee paid them under the contract. Nothing was filed in the nature of a counterclaim. Both sides offered some evidence as to the value of the services rendered by appellees, but that evidence was not offered under any issue as the basis for determination of what fee, if any, should be paid appellees for their services, but solely as bearing upon the good faith of the parties and the reasonableness · of the contract. Appellees have not had their day in court on the question of their right to recover on *quantum meruit*, or the amount of such recovery, if any. The sole question tried in this proceeding was the right to retain the fee collected under the contract sued upon.

We hold that the appellees were not entitled to collect the fee specified in the contract, and should be held to account to the appellant for such fee. This, however, should not deprive the appellees of their rights, if so advised, to litigate the question, in a proper proceeding, of their right to recover on *quantum meruit*, and if such right is established, to have the amount of such recovery determined. The decision in this case is not in any way to be construed as an adjudication of that question.

The cause will be remanded to the district court, with directions that the appellees shall account to the appellant for the amount received by them under the said contract, with interest thereon at 6 per cent per annum from the date the same was received, with leave to the appellees, if so advised, to present to said court, before such accounting is made and judgment entered, their claim for the reasonable value of the services performed by them for plaintiff's intestate in said matter. Their failure so to do shall not, however, be an adjudication of their

rights to recover from the estate of appellant's intestate, in such proceedings as may be proper, the reasonable value of the services rendered by them, if appellees are entitled to the same.

The cause will be remanded to the district court for further proceedings as the parties may be advised, consistent with this opinion. It is so ordered.—*Reversed and remanded.*

PRESTON, C. J., EVANS and STEVENS, JJ., concur.